Filed 2/5/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ROSTACK INVESTMENTS, INC., | B286069 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC428298) |
| v. | |
| ANGELA C. SABELLA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael M. Johnson, Judge; Holly J. Fujie, Judge. Affirmed.

Mayer Brown, Neil M. Soltman, John Nadolenco and Christopher P. Murphy for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Julian W. Poon and Samuel Eckman for Defendant and Respondent.

_____

Plaintiff Rostack Investments, Inc. obtained a summary judgment against defendant Angela Sabella in an amount exceeding $50 million.  We reversed the judgment on appeal, and awarded Sabella her costs as prevailing party.  Sabella's memorandum of costs sought to recover approximately $1.4 million in costs related to her obtaining a surety bond, secured by a letter of credit, pending the appeal.  Rostack moved to tax those costs, on the basis that they were neither reasonable nor necessary, in that Sabella had sufficient assets to obtain a cash-collateralized bond (without needing a letter of credit).  The trial court denied the motion to tax, concluding that Sabella's bond-related expenses were both reasonable and necessary.  The court entered judgment against Rostack for the full amount of the disputed costs, and Rostack appeals.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    *The Underlying Dispute*[1]

Rostack brought suit against Sabella for breach of contract, based on a note with outstanding principal of over $28 million.  In Rostack's operative complaint, it sought unpaid principal and interest, as well as attorney fees and costs of collection, based on an attorney fees/legal expenses clause in the note.

Sabella's answer raised, among other things, the defense of gift.  Sabella argued that the note had simply memorialized an intra-family loan from her multi-billionaire father via Rostack, a corporate entity he had wholly controlled.  Sabella believed her father never intended her to use her own assets to repay the loan, and had, in fact, given her the gift of loan forgiveness prior to his

---

[1]    Our discussion of the parties' dispute and its procedural history is taken from our opinion in the prior appeal.  (*Rostack Invs., Inc. v. Sabella* (Dec. 15, 2016, B260844) [nonpub. opn.].)

2

death.  Sabella took the position that it was her sister, who had since taken control of Rostack, who was pursuing this action against Sabella out of vengeance.

After a great deal of procedural wrangling, the trial court concluded that Sabella could not pursue the gift defense, and entered summary judgment in favor of Rostack, in the amount of $51,906,128.62, plus costs and attorney fees.  Sabella appealed and we reversed, concluding the trial court erred both procedurally and substantively in disposing of Sabella's gift defense.  As Sabella was the prevailing party on appeal, our disposition stated that Rostack was to pay her costs on appeal. The remittitur issued February 15, 2017.

2.     *Sabella's Appeal Bond*

The record in the current appeal reveals the following course of events occurred after the trial court's judgment in favor of Rostack, while Sabella's appeal was pending.

Unless an undertaking is given, the perfecting of an appeal does not stay enforcement of a judgment for money damages.[2] (Code Civ. Proc., § 917.1, subd. (a)(1).)  Initially, Sabella asked Rostack if it would voluntarily stipulate to waiving the bond requirement and agree to not pursue collection pending appeal. Rostack declined.  However, the parties stipulated to several stays of enforcement of judgment, while Sabella investigated various alternatives for obtaining an appeal bond.

An undertaking "shall be for double the amount of the judgment . . . unless given by an admitted surety insurer in which event it shall be for one and one-half times the amount of

---

[2]     The statutes provide that the terms "undertaking" and "bond" may be used interchangeably.  (Code Civ. Proc., § 995.210.)

the judgment . . . ." (Code Civ. Proc., § 917.1, subd. (b).) Even using an admitted surety insurer, as Sabella did, would require a bond in an amount exceeding $77 million.

The bulk of the evidence regarding Sabella's investigation of alternatives consists of several email threads between Sabella's attorneys and Amy Mea, a representative of Bond Services Insurance Agency and Brokerage, LLC. Even before the judgment was entered, Sabella's counsel had started asking Mea about different bond premium rates. Mea explained that the rate quote depended on the type of collateral provided, whether a letter of credit, securities, real estate, or something else. Sabella's counsel asked for "a range of options regarding the collateral," and suggested that Sabella "may be willing to do a cd [presumably, certificate of deposit] or something with the full amount in it." Mea consulted with different sureties, and found one which would charge as little as four-tenths of 1 percent on a bond with a cash deposit.[3]

While Mea was researching rates for a cash deposit, Sabella's counsel was also requesting information on the procedure, and costs, involved in securing the bond with a letter of credit, real property, or securities. Mea explained that with real property, the bond premium is generally 4 percent of the bond amount plus appraisal fees; and with securities, the premium is 3-5 percent of the bond amount. However, the cost

---

[3]     At different times, Mea quoted different rates from different sureties. Because the amount of the bond was so high, some sureties were willing to negotiate on the rate to get the business.

for a bond secured by a letter of credit would be the same lower premium as for a bond secured by cash.

By early December 2014, Sabella's counsel said that she was "likely" to obtain a bond secured by a letter of credit. There followed a different series of e-mails, in which Sabella's counsel and Mea tried to agree on the bank from which Sabella would obtain the letter of credit. Some of the banks Sabella proposed were not acceptable to the sureties for a letter of credit that large. Other proposed banks were unacceptable because they were foreign institutions, while the sureties required FDIC-insured U.S. lenders. Even when the bank was acceptable to the surety, the premium the surety would charge varied, depending on the bank.[4]

Apparently frustrated by her inability to get a low enough premium rate for a bond secured by a letter of credit from a bank acceptable to Sabella, Sabella's counsel again reopened discussion about simply securing the bond with a cash deposit. Mea found a surety which would charge 0.25 percent premium for the bond secured by full cash collateral, and would pay 0.5 percent interest on the deposit. This arrangement would net Sabella 0.25 percent interest on her deposit, but would tie up $77 million in cash for the duration of the appeal. Sabella's counsel asked Mea if there was any way she could "improve upon these rates based on the size of the deposit?" There was not.

Sabella ultimately obtained a bond secured by a letter of credit. The annual premium on the bond was approximately

---

[4] We observe that this is the rate that the surety would charge for the appeal bond itself; Sabella would also be responsible for any interest her bank charged in connection with the issuance of the letter of credit.

0.3 percent of the bond amount. The cost for the letter of credit was 0.6 percent of the same amount.

3.    *Proceedings on the Motion to Tax Costs*

Following our remittitur, Sabella sought her appellate costs, including the bond and letter of credit premiums she had paid for two years, in the total amount of nearly $1.4 million.

Rostack moved to tax several items of Sabella's costs; the only ones at issue in this appeal are the bond and letter of credit premiums. Rostack argued these expenses were not reasonably nor necessarily incurred. Rostack's position was that the e-mail thread, and Sabella's substantial wealth, established that Sabella had the financial wherewithal to obtain a cash-collateralized bond, which would have (1) obviated the need for a letter of credit and (2) netted Sabella 0.25 percent interest in excess of the bond premium.[5] Rostack argued that Sabella instead "obtained a Bond in what appears to be the most expensive way possible." It argued, "Sabella can squander her funds if she wishes. But she cannot do so and demand that her opponent [pay] for her extravagance."

Sabella opposed the motion, supporting her opposition with her own declaration, stating that she chose to secure the judgment with a bond collateralized by a letter of credit because it "was the most economically advantageous for me because it

---

[5]    Rostack also argued that Sabella could have "offered Rostack a security interest in some of her tens of millions of dollars in assets and thereby avoid reliance on surety bonds." Rostack does not pursue this argument on appeal. We believe that, just as Rostack was not obligated to simply refrain from collection based on Sabella's good faith, Sabella was not obligated to offer her litigation adversary a security interest in her own property.

was the least expensive and most feasible" option. She explained that prior to obtaining the bond, she and her advisors "diligently investigated and considered all the various bond options." As for the cash-collateral alternative, Sabella stated that, although she inquired about the costs involved, she "ultimately determined that it was not feasible or economically sound for me to post the $77,859,192.93 bond in cash." She stated that she did not have that amount available in cash at the time, and that, to post such a bond, she would have had to sell many of her assets. As there was not sufficient time to market them, she would have had to let them go at "fire sale" prices, and, in any sale, she would also incur "large taxes, fees and other costs of sale." She concluded that this would have been a "bad financial decision." She selected a letter of credit as collateral over real property or securities as the costs for the former were less. Under all of the circumstances, Sabella "determined that collateralizing the bond with a letter of credit was the most cost efficient, time efficient and prudent option."

In reply, Rostack argued that Sabella impliedly admitted that a cash collateralized bond was available to her, and as this was a less expensive alternative, its availability established that Sabella's choice was neither reasonable nor necessary.[6] Curiously, Rostack then conceded that Sabella's choice may have been financially reasonable *for her*, stating, "Sabella may have had numerous pecuniary incentives to pursue the bond structure

_____

[6] Rostack also argued that Sabella should have backed up the statements in her declaration with financial evidence, and objected to the declaration as lacking in foundation for this reason. The trial court ultimately overruled these objections. On appeal, Rostack notes the court's ruling, but does not argue that it was error.

7

that she did, primarily to avoid lost opportunity costs by encumbering her cash or other assets." Rostack argued, however, that those incentives were simply irrelevant.

At the hearing on the motion to tax costs, the trial court found the bond secured by a letter of credit to have been an arm's-length commercial transaction, reasonably entered into by Sabella, and therefore denied the motion to tax. The court's ruling reflects that Sabella "examined alternative means to stay enforcement and concluded that a surety bond with a letter of credit was the best vehicle for her. [Her] decision and the costs she incurred were reasonable, and [Rostack] has no legal right to demand a less expensive alternative."

4.      *Order to Pay Costs as Judgment*

California Rules of Court, rule 8.278 governs awards of costs on appeal. It provides that the clerk of the Court of Appeal "must enter on the record, and insert in the remittitur, a judgment awarding costs" to the prevailing party. (Cal. Rules of Court, rule 8.278(b)(1).) After discussing the procedure for determining the amount of costs in the trial court, the rule then provides, "An award of costs is enforceable as a money judgment." (Cal. Rules of Court, rule 8.278(c)(3).)

At the end of the hearing on Sabella's motion to tax costs, Sabella's counsel requested that the court order payment be made within 30 days. There was some discussion as to whether the court's cost award would be part of a single final judgment to be entered after trial or a separate judgment immediately appealable. After the hearing, Sabella submitted a proposed judgment; her notice cited to authority that an award of appellate costs constitutes a separate judgment, immediately appealable. Rostack objected to the proposed judgment, arguing that it was

8

premature under the one final judgment rule. The trial court entered the judgment as proposed by Sabella. Rostack filed a timely notice of appeal.

## DISCUSSION

On appeal, Rostack makes two arguments. First, it argues that the court's judgment awarding costs was an improper interlocutory judgment, which is not final or enforceable in any way, although it is appealable as a void judgment. Second, Rostack argues that the bond and letter of credit premiums were not reasonable or necessary as a matter of law, because less expensive alternatives were available. We disagree with both arguments.

1.      *The Judgment for Costs is a Final Enforceable Judgment*

As noted above, California Rules of Court, rule 8.278(c)(3) provides that an award of costs on appeal "is enforceable as a money judgment." Rostack concedes this is so, but argues that the rule does not say "**when** an enforceable judgment for a specific amount of appellate costs should be entered." (Emphasis Rostack's.) Rostack takes the position that the one final judgment rule, as set forth in cases such as *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, requires that there be only a single judgment in any case, and that it is premature to enter an enforceable judgment for appellate costs when the trial is yet to be had.

Rostack's argument is meritless. Indeed, it was rejected as early as 1931, when our Supreme Court resolved *First Nat'l Bank v. Stansbury* (1931) 214 Cal. 190. In that case, the judgment had been reversed on appeal, so the appellant was awarded its appellate costs in a judgment. After retrial, the respondent was successful, and obtained a judgment in its favor for a much

9

smaller amount of costs.  The appellant again appealed the judgment in favor of the respondent and, while the appeal was pending, sought to execute on the prior judgment in its favor for appellate costs (while allowing an offset for the small award in favor of respondent).  (*Id*. at p. 191.)  The issue presented was whether the previously-successful appellant should be enjoined from collecting its costs award until its current appeal of the second judgment was resolved.  The Supreme Court concluded that it should not, stating, "The judgment for costs of appeal in the first case has long since become final and the judgment for costs in the second trial has not yet become final.  [¶]  We perceive no grounds upon which to deny appellants the right to realize upon their judgment.  Oftentimes the trial court refuses to proceed with a second trial until the costs of the appeal from a former judgment have been paid.  [Citation.]  There is no interdependence between the judgment for costs of the former appeal and any judgment which may subsequently be entered in the main case."  (*Id*. at p. 192.)

More recent authority is in accord.  " '[*T*]*rial court costs* are a mere incident of the main judgment, and not separately enforceable [citation], but after appeal, there may be a new trial with even a further appeal, and the proceedings may cover a long period of time.  Accordingly, the award of *costs on appeal*, when properly allowed in the trial court, represents an independent *judgment*, enforceable by any available means.  "It is a complete judgment in itself that finds its origin in the order of an appellate [court] or the Supreme Court affirming or reversing a judgment of a lower court.  The right to such judgment comes into being when the order of the reviewing court becomes final.  The judgment itself is created when the successful party files his cost

10

bill and his costs are taxed." ' [Citation.]" (*Los Angeles Unified School Dist. v. Wilshire Center Marketplace* (2001) 89 Cal.App.4th 1413, 1419.) "If an appeal is taken from the judgment, the party prevailing in the Court of Appeal is usually entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.) The award of costs is included in the remittitur, although the amount of the award is determined in the trial court. (Cal. Rules of Court, rule 8.278(b)(1), (c).) These costs, however, are not added to the trial court judgment, but constitute a separate judgment. [Citations.]" (*Lucky United Properties Investment, Inc. v. Lee* (2010) 185 Cal.App.4th 125, 138 (*Lucky*).)

Rostack overlooks this authority, relying instead on a second appeal in the *Lucky* litigation, *Lucky United Properties Investment, Inc. v. Lee* (2013) 213 Cal.App.4th 635 (*Lucky II*). Rostack suggests that *Lucky II* stands for the proposition that the award of appellate costs does not constitute a separate judgment but is instead incorporated into the trial court judgment. But the *Lucky II* court was distinguishing a *trial court's* award of appellate costs (such as costs and fees awarded pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute) from appellate costs awarded by the *Court of Appeal*, although the amount is determined in the trial court. *Lucky II* reiterated that when the costs are awarded by the Court of Appeal, they constitute a separate judgment, but held that when the costs and fees are awarded by the trial court, they are incorporated into the trial court judgment. (*Lucky II, supra,* at p. 654.) The *Lucky II* court further explained why the two are treated differently. "The rule that appellate court cost awards constitute separate judgments is grounded both in statutory language and in rationales that do not apply to appellate cost and fee awards

11

under [the anti-SLAPP statute]." (*Id*. at p. 655.) These reasons include that when we are concerned with an appellate court cost award, it is the appellate court, not the trial court, that is the source of the award – something which is "conceptually separate" from the trial court judgment. (*Ibid*.) Additionally, "one apparent purpose of the separate judgment rule for appellate cost awards is to allow a litigant to collect the costs without having to wait until the termination of potentially lengthy proceedings on remand, which could not affect its entitlement to the appellate costs." (*Ibid*.)

This is not the only authority on the subject of the finality of an appellate court's cost award. The issue has also arisen in the context of appealability – specifically, whether an order taxing appellate costs (or an order denying a motion to tax those costs) is immediately appealable. In 1994, Division Five of the Second District held that it was not, reasoning that an appellate cost award is not a post-judgment order because, when the case has been remanded for further proceedings, there is no judgment for it to be post. (*Barnes v. Litton Systems, Inc.* (1994) 28 Cal.App.4th 681, 683.) However, in 2011, Division Two of the Fourth District rejected the *Barnes* court's analysis, holding that Division Five had overlooked the fact that an appellate cost order is post- the *judgment of the Court of Appeal*. (*Krikorian Premiere Theatres, LLC v. Westminster Central, LLC* (2011) 193 Cal.App.4th 1075, 1083.) The *Krikorian* court reviewed the history of the issue, and concluded that *Barnes* was an outlier, in that California courts had held such orders were appealable as postjudgment orders to Court of Appeal judgments consistently since 1925. (*Id*. at pp. 1079-1081.) In the course of its analysis, *Krikorian* noted, as did all of the cases we have discussed above,

12

that the "award of costs is immediately enforceable." (*Id*. at p. 1083.) "It cannot be affected by any further proceedings in the trial court." (*Ibid.*)

Rostack does not address much of this legal authority directly. Instead, it makes a factual argument that the appellate cost award in this particular case is *not actually final* because Rostack is suing on a note which contained a clause which would, Rostack alleges, entitle it to recover all of its "legal expenses" from Sabella if it is ultimately successful – and those legal expenses would include the appellate costs previously awarded Sabella. It is, of course, premature for us to consider whether such a clause would extend to appellate costs ordered by this court in connection with the prior appeal. There has been no trial, no prevailing party on the contract, and no attempt to recover any such costs under the clause. This much, however, is clear: the fact that Rostack may, in the future, possibly pursue an argument that it has a right to *reimbursement* for the cost award does not undermine the overwhelming legal authority that the cost award is final.

2.      *The Bond and Letter of Credit Premiums were Reasonable and Necessary*

The trial court's exercise of discretion in granting or denying a motion to tax costs will not be disturbed if substantial evidence supports its decision. (*Jewell v. Bank of America* (1990) 220 Cal.App.3d 934, 941.) The applicable rule of court itemizes the appellate costs which may be recovered "if reasonable." (Cal. Rules of Court, rule 8.278(d)(1).) Those items include, "The cost to procure a surety bond, including the premium, the cost to obtain a letter of credit as collateral, and the fees and net interest expenses incurred to borrow funds to provide security for the

13

bond or to obtain a letter of credit, unless the trial court determines the bond was unnecessary." (Cal. Rules of Court, rule 8.278(d)(1)(F).) As bond premiums and interest expenses incurred to obtain a letter of credit are specifically itemized by the rule, the issue raised by this appeal is whether substantial evidence supports the trial court's conclusion that those items, as incurred by Sabella in this case, were reasonable and necessary. Rostack argues that they were not, because Sabella could have obtained a cash-collateralized bond instead.

However, the mere fact that an alternative procedure, which would have been less expensive, was available does not mandate that the option chosen was unreasonable or unnecessary. (See *Jewell v. Bank of America, supra,* 220 Cal.App.3d at pp. 940-941 [the alternative was uncertain]; *Acoustics, Inc. v. Trepte Constr. Co.* (1971) 14 Cal.App.3d 887, 916 [the alternative may have caused too much delay given the party's financial obligations].) In considering whether premiums were necessary, some factors a court may consider in addition to the availability of alternatives include: the expediency to the judgment debtor of the alternative procedure, the delay the alternative procedure entailed, the risk of using the alternative procedure, and "other additional expense and interference" with business operations which might be incurred by utilization of the alternative procedure. (*Jewell, supra,* 220 Cal.App.3d at p. 941.)

Sabella's declaration explained that she had considered the alternative procedure of a cash-collateralized bond, but had rejected it as not feasible or economically sound for her. She did not have the cash on hand, and would have had to liquidate substantial assets, incurring transaction costs, taxes, and market

14

losses.[7]  Although Rostack sought to challenge this evidence with other evidence suggesting Sabella did, in fact, have sufficient cash easily available, Sabella's declaration constitutes substantial evidence that she did not – and the trial court was free to accept this evidence and reject Rostack's.

There is one final point lurking in the background of this case:  lost opportunity costs.[8]  Rostack's argument that Sabella could have posted a cash-collateralized bond, and thereby earn a net of 0.25 percent on her deposit, assumes not only that Sabella had $77 million in ready cash, but also assumes that the same $77 million could not have been put to better work for Sabella and earn her a great deal more than the 0.25 percent she would have received if it was tied up in the bond.  Indeed, unspoken in Sabella's declaration was the premise that, given the choice between a net gain of 0.25 percent on a deposit of $77 million,

---

[7]  Rostack focusses on Sabella's statement, "At the time I obtained the bond, I did not have $77,859,192.93 available in cash."  Rostack argues that this statement is a "negative pregnant," which is pregnant with the implication that she had the cash ready at a nearby date, or had the amount less one cent available on the date she obtained the bond.  We need not address this argument because it takes Sabella's statement out of context.  Sabella's declaration explained that to be able to post the cash, she would have had to sell "many" of her assets at "fire sale" prices – statements which flatly contradict the implied statements Rostack would infer from the so-called "negative pregnant" standing alone.

[8]  Sabella raises the issue in her respondent's brief on appeal, but did not specifically address it before the trial court.  We do not address the evidence she raises on the point for the first time on appeal.  As we have noted, Rostack discussed the issue in its reply in support of its motion to tax costs.

and a net loss of 0.9 percent in bond/letter of credit premiums, the loss of 0.9 percent was the preferable choice – given what she could otherwise do with her $77 million. Rostack itself recognized the point, stating, "Sabella may have had numerous pecuniary incentives to pursue the bond structure that she did, primarily to avoid lost opportunity costs by encumbering her cash or other assets." Rostack stated, however, that "the law is clear that such lost opportunity costs should not be taken into consideration when awarding costs on appeal." On the contrary, the law is only that lost opportunity costs should not be *awarded*. (See *Siry Investments, L.P. v. Farkhondehpour* (2015) 238 Cal.App.4th 725, 733 [acknowledging the argument that an appellant might seek lost opportunity costs was "a valid concern," but holding it did not apply in that case]; *Sequoia Vacuum Systems v. Stransky* (1964) 229 Cal.App.2d 281, 289 [not allowing recovery of interest associated with borrowing money to deposit a cash bond for fear that to do so would open the door to recovery of lost opportunity costs].) The parties have not cited, and independent research has not disclosed, any authority specifically addressing whether lost opportunity costs are a factor which can be taken into consideration when determining whether costs incurred were reasonable and necessary. We believe that lost opportunity costs are an appropriate factor in determining the method used to bond the judgment. If lost opportunity costs are *not* considered at all, an appellant must choose the bonding alternative which will result in the lowest cost being passed on to the respondent (should the appellant be successful on appeal) even if that alternative results in a greater net financial loss to the appellant if the appeal is unsuccessful and the appellant must bear the costs itself. If "reasonable" is to mean anything, it

16

must mean reasonable to the appellant under all of the circumstances. It is reasonable for the appellant to choose the method that is cost-effective based on its own financial situation; not to be forced to choose what might be best for the respondent. (See *Jewell, supra,* 220 Cal.App.3d at p. 941 [identifying factors in the reasonableness analysis from the debtor's point of view].)

The trial court's determination that the bond and letter of credit costs were reasonable and necessary is supported by substantial evidence, and therefore must be affirmed.

## DISPOSITION

The judgment awarding costs is affirmed. Rostack is to pay Sabella's costs on appeal.

RUBIN, J.*

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

---

* Presiding Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.