Filed 11/13/23 Rostack Investments v. Sabella CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| ROSTACK INVESTMENTS INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANGELA C. SABELLA, <br><br> Defendant and Appellant. | B311811 <br><br> (Los Angeles County <br> Super. Ct. No. BC428298) |
| ROSTACK INVESTMENTS INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ANGELA C. SABELLA, <br><br> Defendant and Appellant. | B314779 (Consol. w/B316924) <br><br> (Los Angeles County <br> Super. Ct. No. BC428298) |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County.  Holly J. Fujie, Judge.  Affirmed.

Mayer Brown, John Nadolenco, Daniel D. Queen, Jennifer M. Chang, Neil M. Soltman, Matthew H. Marmolejo, C. Mitchell Hendy, and Nicole A. Saharsky, *pro hac vice*, for Plaintiff and Appellant.

Larson, Stephen G. Larson, and Jerry A. Behnke for Defendant and Appellant.

_____

## INTRODUCTION

After over a decade of no-holds barred litigation that culminated in a nine-day bench trial, the trial court entered a judgment in favor of Rostack Investments, Inc. (Rostack) and against Angela Sabella (Sabella) in the amount of $69,636,784.60. While the history of this case is voluminous, it is essentially a dispute between Sabella and her younger sister, Vivien Chen (Vivien), over the distribution of assets by their late father, Chen Din-Hwa (Chen). Chen was one of the richest persons in the world and founder of the Nan Fung Group, a multi-billion-dollar transnational conglomerate based in Hong Kong. The present dispute involves a promissory note executed by Sabella to purchase real property known as the Two Bear Ranch. Rostack, a corporation wholly owned by Chen's estate, was the lender on the note. After entering judgment in Rostack's favor, the trial court awarded Rostack its attorney fees and costs. Both parties appealed.

In the first appeal, Sabella argues the trial court deprived her of her right to a jury trial after it severed her equitable defenses from her legal ones and conducted a bench trial, then concluded its findings of fact were dispositive of any remaining legal claims.

In the second appeal, Sabella argues the trial court erred when it awarded Rostack attorney fees for legal work performed by Rostack's Hong Kong counsel, and then abused its discretion when it did not reduce the attorney fee award based on Rostack's domestic counsel's impermissible billing practices.

In the third appeal, Rostack argues the trial court erred by not awarding Rostack additional costs related to Sabella's successful appeal in a nonpublished opinion *Rostack Investments, Inc. v. Sabella* (Dec. 15, 2016, B260844) (*Rostack I*) where we awarded Sabella her costs. On remand, the trial court entered judgment in her favor in the amount of $1,366,104.28, allowing her to recover her surety bond expenses. We affirmed Sabella's right to immediately enforce that judgment in *Rostack Investments Inc. v. Sabella* (2019) 32 Cal.App.5th 70, 82 (*Rostack II*). Rostack now asserts it is entitled to reimbursement of those costs since it ultimately prevailed at trial.

For the reasons set forth below, we affirm the judgment and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Two Bear Ranch transaction

In 1995, Sabella located the Two Bear Ranch, a 36,000 acre property on the Utah-Wyoming border, and approached Chen about purchasing the property as an investment and for future development. The purchase price was $25,500,000. While Chen agreed to help Sabella purchase the property, he did not give the purchase money to her outright. Instead, he loaned the money to Sabella through Rostack, a Liberian corporation and a subsidiary of another company wholly owned by Chen.

Sabella executed a promissory note in favor of Rostack, dated July 5, 1995 for $30,000,000. The loan was for the

$25,500,000 purchase price with the balance as working capital for development. The note had a 15-year term and required Sabella to pay 10 percent annual interest on the loan and to pay the outstanding principal and any unpaid interest in one lump sum when the note matured. The note contained a California choice-of-law clause and was subsequently modified to give Sabella the option of extending the maturity date for five years.

The purpose of structuring the Two Bear Ranch transaction in this manner conferred certain tax benefits to Chen and Sabella. By loaning the money to Sabella through Rostack, Chen avoided paying a substantial withholding tax while Sabella deducted the annual interest payments from her taxable investment income, thereby reducing her tax burden by millions of dollars.

Each year between 1995 and 2006, Chen gifted Sabella the approximate amount of the 10 percent annual interest due on the note. In turn, Sabella would pay Rostack for the annual interest. Sabella paid the annual interest on the note for the first eleven years, and occasionally repaid some principal.

Shortly after the Two Bear Ranch transaction, Chen was diagnosed with Alzheimer's disease and by the early 2000's, his health was failing. Accordingly, he began considering how to divide his assets between Sabella and Vivien. In one proposal that was memorialized by Vivien on a handwritten document called the "family table," Chen proposed giving Sabella and Vivian each $400 million in cash and other assets. Sabella would get Chen's real estate assets in the United States while Vivien would get Chen's Hong Kong real estate assets of the same value.

After August 2006, Sabella stopped making annual payments on the note.

4

In 2007, Sabella believed Vivien was taking advantage of Chen's deteriorating mental capacity and attempting to seize control over the Nan Fung Group.  To prevent this, Sabella successfully petitioned for a conservatorship and had Chen declared mentally incompetent.  After the conservatorship, Vivien assumed control over the Nan Fung Group.

In May 2009, Rostack notified Sabella she was in default under the note and demanded the entire unpaid principal balance of $28,273,000 and accrued unpaid interest in the amount of $8,063,614.52.  In a June 8, 2009 letter from Vivien to Chen's court-appointed conservator, Vivien wrote:  "Regarding the Two Bear Loan, Rostack decided to take aggressive action to chase the loan because our auditors had started to question the status of this loan.  They were asking what steps we had taken to recover the loan or should they actually write the loan off.  Thus, we had no choice but to take more aggressive actions to recover the loan."

## II.    Rostack's complaint and Sabella's answer

On December 18, 2009, Rostack sued Sabella for breach of contract, book account, and money lent.  Rostack attached copies of the note, the option agreement extending the loan's maturity date, and its demand letter as exhibits to the complaint.

Sabella's answer pleaded seven affirmative defenses. Sabella's affirmative defenses were based on three theories. First, Sabella alleged Rostack had suffered no damages because it provided no consideration for the note as the funds to purchase the property were provided by Chen, not Rostack.  Second, Sabella alleged, in any event, Chen forgave or discharged the note by gifting the Two Bear Ranch to her.  Third, if Chen did not actually gift the Two Bear Ranch to Sabella and forgive the note, Sabella executed the note with the understanding Chen would

5

gift the property or forgive the note at some point in the future, therefore, Rostack was estopped from enforcing the note.

Sabella's sixth affirmative defense was labelled "Estoppel" and was based on the following allegations.

Chen gave Sabella all the funds to purchase the Two Bear Ranch. Chen intended to eventually gift the Two Bear Ranch to Sabella, but he "was a careful man and did not give [Sabella] the gift outright." On the advice of counsel and other tax professionals, he structured the transaction to avoid a withholding tax and to allow Sabella to deduct her interest payments paid toward the note. Chen and Sabella understood and agreed that Chen would provide annual gifts of funds to Sabella to pay the interest on the note. Because the Two Bear Ranch could not generate sufficient revenue to service the debt obligation, Chen knew Sabella would not have signed the note or assumed any liability for the note unless she received these annual gifts from him. The purpose of this agreement was to ensure Sabella would not be held financially responsible for paying any amounts due under the note. In reliance on the understandings and agreements, Sabella proceeded with the transaction.

Rostack knew Chen provided Sabella the funds to make the annual interest payments, which she paid to Rostack. Rostack was also aware Chen gave the Two Bear Ranch loan to Sabella. Nonetheless, Rostack wrongfully repudiated Chen's donative intent to make a gift to Sabella. "Under the circumstances, it would be inequitable to require [Sabella] to pay Rostack any amounts allegedly due on the Note."

Because Chen and Rostack, as Chen's agent, understood and agreed that Sabella was dependent upon the gift

6

arrangement to fund the interest payments as evidenced by his annual gifts to her from 1995 to 2006, and that she would never have agreed to sign the note absent that arrangement, Rostack is estopped from claiming the note is in default or recovering any amounts due under the note. Rostack is further estopped from enforcing the note since Sabella understood the Two Bear Ranch loan was gifted to her by Chen, and did not take any steps to refinance or obtain other sources of funding to repay the loan.

Sabella's estoppel defense also incorporated "as if set forth fully herein" all of the previously alleged paragraphs in her answer, including "Facts Common to All Affirmative Defenses," which alleged the making and delivery of Chen's gift of Two Bear Ranch to Sabella.

## III. Rostack's motions for summary judgment and Sabella's successful appeals

In December 2011, Rostack filed a motion for summary judgment, which was denied. The trial court found that while Rostack had met its initial burden by showing a valid contract and Sabella's breach, Sabella successfully raised a triable issue of fact regarding whether Chen gifted the note to her.

After the case was reassigned to a different judge, Rostack filed a second motion for summary judgment, which was granted. The trial court found Rostack met its burden to show a valid contract, Rostack's performance, and Sabella's breach. The trial court further found that Sabella's defenses were insufficient to defeat Rostack's claims.

Sabella appealed the second summary judgment ruling. She also filed a surety bond for approximately $77.8 million, the amount required to stay enforcement of the judgment. She procured a letter of credit to satisfy the insurer's demand for

7

collateral to secure its risk on the surety bond. Sabella's bonding costs totaled $1,366,104.28, which was comprised of $464,819.38 for the bond and $934,395.32 for the supporting letter of credit, minus a $33,110.42 rebate.

We reversed the judgment in *Rostack I*, holding Sabella had established a triable fact issue on her gift and estoppel defenses, namely, whether Chen intended to forgive the note as a gift to her and in fact did so at a family meeting in February 2005. (See *Rostack I*, *supra*, B260844.) We also held this triable issue of fact applied equally to both Sabella's gift and estoppel defenses, noting "the estoppel affirmative defense relies upon, and appears to be a restatement of, the gift defense." (*Id*. at p. 22, fn. 9.) We ordered Rostack pay Sabella's costs on appeal. (*Id*. at p. 22.)

Upon remand, Sabella filed a costs memorandum, seeking to recover $464,819.38 in surety bond premium payments that were necessary to obtain the appeal bond, and $934,395.32 in costs to obtain a letter of credit as security for the surety bond. Rostack moved to tax costs, arguing Sabella's costs were not reasonably incurred because she could have pursued a less expensive alternative and it would be premature to enter a judgment for those costs before the ultimate prevailing party was determined. The trial court rejected those arguments and entered a judgment in favor of Sabella, awarding her $1,377,511.59 in appellate costs. Rostack appealed the award.

This court affirmed the judgment in *Rostack II*, *supra*, 32 Cal.App.5th at page 82, holding Sabella could enforce the judgment immediately despite the possibility Rostack could prevail at trial. (*Ibid*.) We rejected Rostack's argument that it was "premature to enter an enforceable judgment for appellate

8

costs when the trial is yet to be had." (*Id.* at p. 78.) We relied on the weight of authority which held that an " 'award of costs is immediately enforceable' " and " '[i]t cannot be affected by any further proceedings in the trial court.' " (*Id.* at p. 80.)

Upon remand, Rostack satisfied the judgment, including the approximately $1,377,511.59 in surety bond costs.

## IV. Rostack's motion to bifurcate and sever Sabella's estoppel defense

Before trial, Rostack moved to sever Sabella's estoppel defense from any remaining claims, and requested a bench trial on the estoppel defense followed by a jury trial on any remaining legal issues. Sabella opposed severance, arguing bifurcation would not be judicially economical because "all or nearly all of the same evidence would have to be presented for the factfinder to properly adjudicate each defense." The trial court granted Rostack's motion, finding Sabella's estoppel defense was an issue to be determined by the trial court and that severance was judicially economical because of the substantial overlap between the estoppel and gift defenses. In its ruling, the trial court stated findings on Sabella's estoppel defense may obviate the need for a jury trial on her legal defenses.

## V. Trial

The trial court conducted a nine-day bench trial on Sabella's estoppel defense. The trial court heard live and videotaped testimony from 16 witnesses, and the parties submitted thousands of pages of exhibits and deposition transcripts.

At the conclusion of evidence, the trial court rejected Sabella's estoppel defense. It found Sabella was not a credible witness and rejected her allegation that Chen promised to forgive

9

or gift the note to her. The trial court based its finding "in large part upon her drastic and contradictory changes in testimony at trial when she was confronted by evidence that her prior testimony had been refuted." The trial court noted Sabella contradicted many of her prior filed declarations, specifically, major contradictions in Sabella's testimony regarding the circumstances surrounding the family table.

The trial court also made the following findings of fact.

The note and the Two Bear Ranch transaction were part of a tax-driven plan to allow Sabella to acquire the property while taking tens of millions of dollars in tax deductions for her interest payments paid to Rostack, which she did from 1996 through 2006. The transaction also allowed Rostack and Chen to avoid a 30 percent withholding tax. To achieve this dual purpose, the loan had to be legitimate and the note needed to be fully enforceable against Sabella. If Chen forgave or cancelled the note, it would have generated a "huge tax bill" for Rostack and "endanger[ed] the tens of millions of dollars in interest deductions [Sabella] had already taken" if the tax authorities audited the transaction for tax evasion. Likewise, if Sabella or Chen intended the note to be unenforceable from the beginning or that Chen would forgive it at some time in the future, "neither of them would have been able to take advantage of the carefully-planned tax advantages."

There was no competent evidence as to the meaning of Chen's annotation on the family table and, in any event, it became "nothing but a meaningless note on a draft document," since Chen's ultimate distribution did not use the formula proposed in the family table. Sabella never submitted a formal written proposal to Chen, which the parties knew would have

10

been required, to cancel the note or pay it off. While Sabella eventually submitted formal proposals to Chen to give her cash to repay the principal on the note, the proposals came at least 16 months after the annotation on the family table was allegedly made, and none of the proposals were signed by Chen. In fact, there was no evidence Chen forgave or agreed not to enforce the note.

Because Sabella's pleadings did not specify whether she was relying on promissory or equitable estoppel, the trial court analyzed and applied its findings of fact to both theories.

With respect to promissory estoppel, the trial court found that, while Chen did make a promise to Sabella in connection with the note that she would not be " 'out of pocket' " in entering into the transaction, Chen did not promise that he would forgive, cancel, or not enforce the repayment of the principal of the note. Nor did he promise to give Sabella the money to pay off the remaining principal on the loan or forgive the note. From the outset of the transaction, it was the parties' intent that Sabella be obligated to pay off the note when due from the proceeds of the development and sale of the property. The trial court noted that none of the evidence of events before the transaction "was consummated referred to any agreement to forgive the [n]ote—not surprisingly, as any such admission would be evidence that the [t]ransaction was an elaborate tax fraud."

In support of Sabella's equitable estoppel theory, the trial court found Sabella's mistaken belief, that the note would not be enforced if she failed to pay the interest and principal, was the only alleged misrepresentation or fact unknown to Sabella on which she detrimentally relied. However, Sabella's claims were belied by the record, which established Chen's intent for Sabella

11

to act as if the note was valid and enforceable, and Sabella's understanding and treatment of the note as legitimate in order to claim the tens of millions of dollars in interest deductions on her tax returns from 1996 through 2006.

## VI. The trial court declines to conduct the second phase of trial and enters a judgment in favor of Rostack

In light of the overlap between Sabella's estoppel defense and gift defense, the trial court asked the parties to brief whether a second phase of trial was necessary.

After accepting briefing and hearing argument, the trial court concluded a second phase of trial was unnecessary. The trial court explained that its findings about the purported gift and Chen's intent necessarily resolved Sabella's gift defense. The trial court noted Sabella's "estoppel defense relied in part upon a finding that a gift existed" and that Sabella's operative pleading expressly based the estoppel defense on Sabella's allegation Chen "intended to and did in fact gift her with the Two Bear Ranch and consequently the [n]ote." It also noted *Rostack I* found and relied on the conclusion that Sabella's "estoppel defense . . . was a restatement of the gift defense."

The trial court also rejected Sabella's argument that she did not have the opportunity to litigate the gift issue, noting Sabella presented significant evidence on the gift issue in support of her estoppel defense. The trial court relied on the fact that Sabella's operative pleading "expressly incorporated the allegations of gift" into the estoppel defense, and that the trial court "was required to address the issue of gift" to resolve the estoppel defense.

The trial court also found a second phase of trial was unnecessary because Rostack had proven its affirmative claims,

12

finding no factual disputes regarding the validity of the note or whether Sabella breached the terms of the note.  The trial court held its findings on the estoppel defense resolved Sabella's other affirmative defenses that rested on the alleged gift, e.g., discharge and unjust enrichment.  It also found that its findings resolved Sabella's other remaining defenses—lack of consideration, failure to state a claim, and lack of damages— because it found Sabella and Chen considered the note to be fully enforceable at all times and Sabella acknowledged the note was a valid loan.  Thus, the trial court concluded there was nothing left to submit to a jury.

The court issued a judgment in Rostack's favor, ordering Sabella to pay $28,273,000 in principal and $41,363,784.60 in interest.

## VII.  Rostack's attorney fees and costs award

Rostack filed a cost memorandum under Code of Civil Procedure[1] sections 1032 and 1033.5, seeking a total of about $1.6 million, including about $1.4 million in surety bond expenses it paid to Sabella after *Rostack I* and *Rostack II*.  The trial court awarded Rostack $239,103.99 in costs but denied the request for reimbursement of Sabella's appellate cost award for the surety bond.

Rostack also moved for an award of attorneys' fees, costs, and expenses under the note.  Rostack provided four supporting declarations, including two from Rostack's primary counsel, Mayer Brown LLP (Mayer Brown), one from an attorney at Rostack's Hong Kong counsel, Wilkinson & Grist, Solicitors &

---

[1]     All undesignated statutory references are to the Code of Civil Procedure.

Notaries (Wilkinson), and one from an expert fee witness. Mayer Brown's and Wilkinson's declarations described the division of labor between the two firms, with Mayer Brown acting as lead counsel and the sole firm ever appearing on Rostack's behalf in this action, and Wilkinson's assistance with the coordination of Hong Kong-based witnesses and documents, advice on issues of Hong Kong law and procedure relevant to Sabella's gift and estoppel defenses, and advice regarding the numerous depositions taken in Hong Kong under Hong Kong law.

Rostack also submitted Mayer Brown's and Wilkinson's voluminous billing entries, documenting the fees it sought to recover for the 12-year-long litigation. Mayer Brown explained it had written off approximately $1.8 million in legal fees and costs before invoicing Rostack. Rostack claimed it was requesting 94 percent of the fees it had paid Mayer Brown and 40 percent of the fees paid to Wilkinson. Mayer Brown's attorneys explained they had eliminated fees for 48 out of 60 timekeepers who billed less than 250 hours to the litigation to reduce the risk of duplicative fees. Wilkinson also eliminated any potentially overlapping work performed by Mayer Brown.

In total, Rostack sought $25,230,719.34 for fees paid to Mayer Brown and $3,882,908.53 paid to Wilkinson. Additionally, Rostack again sought reimbursement for Sabella's appellate costs awarded in *Rostack I*.

Sabella opposed the fee request, arguing it should be reduced to $9,834,162.43 and submitted her own fee expert's declaration in support. Sabella argued the trial court should exclude any recovery by Wilkinson, and that Mayer Brown's fees should be drastically reduced as excessive and because Mayer Brown utilized block-billing, billed in quarter-hour increments,

14

and engaged in noncompensable intra-office conferencing. With respect to Rostack's costs, Sabella argued Rostack was not entitled to recover the bond costs because she was already awarded those costs after *Rostack I* and *Rostack II*, and Rostack could not recover the costs under the terms of the note.

The trial court awarded Rostack $21,375,529.27 in fees, applying historical rates and reducing Rostack's fee request by $5,234,293.45. The trial court found the length and complexity of the litigation, and Rostack's counsel's reputation as one of the world's leading law firms, justified the substantial fee award. The trial court recounted various factors contributing to the case's complexity, including litigating Rostack's standing to sue in two rounds, litigating issues related to gift law in both Hong Kong and California, litigating issues of whether the issuer of the note was an indispensable or necessary party, taking depositions in Hong Kong, litigating Sabella's attempts to disqualify one of the five trial judges on the case, litigating three writ petitions in the Court of Appeal and two petitions for review in the California Supreme Court, and preparing for trial several times between 2011 and 2019. It also found Mayer Brown's use of block billing, quarter-hour billing increments, and intra-office conferencing did not justify a further downward departure. The trial court held Wilkinson was entitled to its fees because it advised Rostack on matters related to Hong Kong law relevant to the litigation.

## VIII. The parties' appeals

Rostack and Sabella both appealed with Sabella appealing the trial court's decision to sever her estoppel defense and the attorney fee award. Rostack appealed the trial court's decision to not award Rostack the surety bond costs. On March 24, 2022, we consolidated Sabella's appeal from the fee award and

Rostack's appeal from the cost award under case No. B314779. We consolidated all three appeals for purposes of argument and decision.

## DISCUSSION

Sabella's first appeal concerns the trial court's decision to enter judgment in Rostack's favor without a jury trial, after it severed Sabella's estoppel defense and conducted a bench trial on that issue. Sabella argues this was error as her estoppel defense was not severable, she consistently took the position her estoppel defense was distinct from her legal gift defense, and she was deprived of her right to a jury trial on her remaining legal defenses and Rostack's affirmative claims.[2]

Sabella's second appeal concerns the substantial attorney fees awarded to Rostack for work performed by Mayer Brown and Wilkinson. Sabella argues the trial court erred in awarding any fees to Wilkinson, which engaged in the unauthorized practice of law in California and was therefore not entitled to compensation. Sabella further asserts the trial court abused its discretion in not reducing Rostack's fee award based on Rostack's counsel's duplicative work, block billing, billing in quarter-hour

_____

[2]     Rostack requested judicial notice of an excerpt of the reporter's transcript of the trial proceedings and an excerpt of the transcript of the videotaped deposition of Alan Chan Cheuk Yin dated February 20, 2013. Sabella did not oppose the request. We deferred ruling on the request until we considered the merits of this appeal. We now grant the request after finding the transcripts to be a proper subject of judicial notice. (Evid. Code, § 452, subds. (d)(1) and (h).)

16

increments, billing for excessive intra-office conferencing, and billing for clerical tasks.

Rostack's appeal concerns the trial court's decision to not award Rostack additional costs for reimbursement for the surety bond expenses awarded to Sabella in *Rostack I*. Rostack argues it is entitled to recoup those costs as the prevailing party by statute or as legal expenses under the note.

We address each appeal in turn.

I.    **The trial court had discretion to decide Sabella's equitable defense first, and it correctly found that its findings foreclosed any remaining claims**

Sabella puts forth several arguments in support of her contention that the trial court erred in severing her estoppel defense, thus depriving her of her right to a jury trial.

First, she argues the trial court's decision to sever her estoppel defense violated section 597, which allows a trial court to sever certain defenses, but only when those defenses do not involve the merits of the plaintiff's claims. Second, she argues her estoppel defense was nonseverable because it overlapped significantly with her legal defenses, therefore, the "gist of the action" was legal and the entire action should have been submitted to a jury. Third, Sabella argues, even if the trial court could sever her estoppel defense and conduct a separate bench trial on that issue, the trial court should have empaneled an advisory jury, and the law-of-the-case doctrine required the trial court to try the legal issues first or concurrently. Fourth, Sabella argues that irrespective of the trial court's findings of fact after the bench trial, there remained unresolved issues that should have been tried to a jury.

We are not persuaded.

17

### A. Standard of review

After a bench trial, we review the trial court's factual findings for substantial evidence and its conclusions of law de novo. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) We review the question of whether a party was entitled to a jury trial de novo. (*DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 179 (*DiPirro*).) "We review the court's order determining the sequence of a bifurcated trial for abuse of discretion." (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 353 (*Orange County*).) We will only reverse "a decision regarding the management of a case for trial and the order in which issues are to be tried only for a manifest abuse of discretion." (*Huff v. Securitas Sec. Servs. USA, Inc.* (2018) 23 Cal.App.5th 745, 763.)

### B. The trial court did not err or abuse its discretion by severing Sabella's equitable defense and conducting a bench trial to decide the issue

#### 1. Section 597 was only one of several statutes granting the trial court the authority to sever Sabella's estoppel defense

Sabella contends the trial court erroneously severed her estoppel defense under section 597, which allows a trial court to sever special defenses when those defenses do not go to the merits of the plaintiff's causes of action.

Section 597 provides in part: "When the answer . . . sets up any other defense not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof, the court may, either upon its own motion or

18

upon the motion of any party, proceed to the trial of the special defense or defenses before the trial of any other issue in the case, and if the decision of the court, or the verdict of the jury, upon any special defense so tried . . . is in favor of the defendant pleading the same, judgment for the defendant shall thereupon be entered and no trial of other issues in the action shall be had unless that judgment shall be reversed on appeal or otherwise set aside or vacated . . . ." (*Ibid.*)

Sabella argues it is indisputable her estoppel defense involved the merits of Rostack's claims given the trial court rendered judgment on Rostack's claims based solely on its findings on her estoppel defense. According to Sabella, this is the exact scenario forbidden by section 597.

We note, initially, it is not entirely clear section 597 applied here. The issue of whether Sabella's estoppel defense constituted a "special defense" under section 597 was never litigated. Both Rostack's motion to sever Sabella's estoppel defense and the trial court's order appear to presume without analysis that section 597 applied. Likewise, Sabella's opposition did not address the issue, containing no citations to section 597. Given the trial court's conclusion that its findings on Sabella's estoppel defense foreclosed the need for a jury trial on any remaining legal claims, it certainly appears the estoppel defense involved the merits of Rostack's claims and was not a special defense under section 597.

However, even assuming the trial court erroneously relied on section 597 to sever Sabella's estoppel defense, the error was not prejudicial as the trial court had additional authority for severance. Indeed, the trial court also relied on section 1048, subdivision (b), which codifies the trial court's authority to sever issues and bifurcate the trial. Section 1048, subdivision (b),

19

reads: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action, including a cause of action asserted in a cross-complaint, or of any separate issue or of any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States." (*Ibid.*) Further, as Rostack correctly points out, section 598 provides that even if an issue does not qualify as a "special defense," a court still may sever and try "any issue or any part thereof" if doing so would promote "the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation." (*Ibid.*) Additionally, Evidence Code section 320 provides the trial court with discretion to "regulate the order of proof." (*Ibid.*)

Thus, even if the trial court erred by partially relying on section 597, there were other provisions on which the trial court could and did rely on as grounds for severance. Accordingly, because the trial court arrived at correct result, any purported error is not grounds for reversal. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

To the extent the trial court relied on section 1048, subdivision (b), Sabella argues bifurcation of the equitable and legal issues was not economical because the estoppel and gift defenses did "not substantially overlap." However, Sabella's argument is inconsistent with her other argument that the issues overlapped to such an extent that the defenses were nonseverable.

In any event, whether severance is judicially economical is a decision entrusted to the trial court's broad discretion. (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 625–626.) Here,

20

Sabella based her defenses on the same factual allegations, specifically, that Chen intended to and did in fact gift her with the Two Bear Ranch and consequently the note. Because Sabella's defenses had significant factual overlap, the trial court was correct to assume resolution of certain factual issues would obviate the need for a lengthy jury trial. (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 156–157 (*Hoopes*).)

> **2. The trial court properly followed California's equity first preference and the "gist of the action" did not entitle Sabella to a jury trial on her estoppel defense**

Sabella contends regardless of the trial court's statutory authority to sever her equitable defense, the "gist of the action" was legal, therefore, the trial court should have submitted the entire case to a jury. Sabella further contends the trial court's refusal to do so deprived her of her right to a jury trial, which is reversible per se. We disagree.

"Article I, section 16 of the California Constitution—the jury trial provision—states in relevant part that '[t]rial by jury is an inviolate right and shall be secured to all . . . .' " (*Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County* (2020) 9 Cal.5th 279, 315 (*Nationwide*).) " 'Our state Constitution essentially *preserves* the right to a jury in those actions in which there was a right to a jury trial at common law at the time the Constitution was first adopted.' " (*Ibid*.) In contrast, "suits in equity that were not triable by a jury in 1850" generally afford litigants no right to jury trial. (*Nationwide*, at p. 315, citing *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8–9 (*C & K Engineering*).)

21

" ' "In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the gist of the action.  A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law." ' " (*Nationwide*, *supra*, 9 Cal.5th at p. 315.)

"When the legal and equitable causes of action or issues presented in a case are severable, past California decisions establish that a party retains the right to a jury trial of the severable legal issues and a court trial of the severable equitable issues." (*Nationwide*, *supra*, 9 Cal.5th at pp. 316–317.) Nonetheless, "[a] trial court handling such a combined action could, and in many cases should, hold a bench trial on any equitable issues first.  [Citation.]  '[I]f any legal issues remain [after the bench trial], a jury may be called.'  [Citations.]  Thus, while a plaintiff retained his jury trial right, the extent of the issues actually tried by jury could be impacted by the trial court's findings in equity." (*Orange County*, *supra*, 12 Cal.App.5th at pp. 354–355.  The court's findings in equity "may leave nothing for a jury to resolve." (*Nationwide*, at p. 317.)

The equity trial may limit the scope of a later jury trial because " 'Issues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated.' " (*Orange County*, *supra*, 12 Cal.App.5th 252, 355, fn. 52.)  "And although a trial court retains discretion regarding the order in which the issues should be tried, the governing California cases express a preference that the equitable issues be tried first." (*Nationwide*, *supra*, 9 Cal.5th at p. 317; see also *Orange County*, at p. 355 [citing cases].)  "This general 'equity

22

first preference' is a long standing feature of California law and has always been viewed as fully compatible with the right to jury trial embodied in the California Constitution." (*Nationwide*, *supra*, 9 Cal.5th at p. 317.)

Here, Sabella's estoppel defense, whether characterized as promissory estoppel or equitable estoppel, was an equitable defense to be determined by the court, not a jury.[3] (See *C & K Engineering, supra*, 23 Cal.3d at p. 8 [promissory estoppel]; *Hoopes, supra*, 168 Cal.App.4th at p. 161 [equitable estoppel].) As the master of her pleading, Sabella chose to separately allege her estoppel defense while also relying on the same underlying theory and factual allegations for each of her affirmative defenses—that the note was unenforceable because Chen gifted Two Bear Ranch to Sabella and forgave the note. By asserting a purely equitable defense that relied on the same allegations as her legal defenses, once the trial court severed the estoppel defense and bifurcated trial, Sabella bore the risk of having the trial court's factual findings bind the jury. (See *Hoopes*, at p. 156.) Moreover, at any point, Sabella could have abandoned her equitable defense to preserve the jury trial, but she chose not to. (See *Darbun Enterprises, Inc. v. San Fernando Community Hospital* (2015) 239 Cal.App.4th 399, 411 (*Darbun*).)

We find our Supreme Court's decision in *C&K Engineering*, *supra*, 23 Cal.3d 1, instructive. There, the plaintiff sued the defendant for breach of contract related to a construction bid. Plaintiff's complaint alleged money damages when plaintiff was

---

[3] Sabella's operative answer did not specify whether she was relying on promissory or equitable estoppel. Accordingly, the trial court made findings as to both theories.

forced to perform the work that defendant had promised to perform and alleged " '[i]njustice can be avoided only by enforcement of defendant's promise to perform.' " (*Id*. at p. 5.) "Defendant's answer to the complaint alleged its bid was the result of an 'honest mistake' in calculation; plaintiff knew of the mistake but failed to notify defendant or permit it to revise its bid as is customary in the industry; and plaintiff's conduct in this regard should bar it from recovering damages." (*Ibid*.) The defendant demanded a jury trial. (*Ibid*.) The trial court denied the request, deeming the case to be "essentially in equity" but still empaneled an advisory jury "to consider the sole issue of plaintiff's reasonable reliance on defendant's promise." (*Ibid*.) The jury found that plaintiff reasonably relied to its detriment on defendant's bid. (*Ibid*.) The trial court adopted this finding and entered judgment in plaintiff's favor in the amount of its prayer. (*Id*. at pp. 5–6.) Defendant appealed, arguing it was improperly denied a jury trial of plaintiff's action for damages. (*Id*. at p. 6.)

After concluding the doctrine of promissory estoppel was "essentially equitable in nature," the court turned to whether "the equitable nature of plaintiff's action precluded a jury trial as a matter of right." (*C & K Engineering*, *supra*, 23 Cal.3d at p. 8.) While the court recognized plaintiff's complaint sought damages for breach of contract, the "gist of the action" was equitable because "the complaint seeks relief which was available only in equity, namely, the enforcement of defendant's gratuitous promise to perform its bid through application of the equitable doctrine of promissory estoppel." (*Id*. at p. 9.)

Like *C & K Engineering*, here, Rostack sued for breach of contract "in form an action at law in which a right to jury trial ordinarily would exist." (*C & K Engineering*, *supra*, 23 Cal.3d at

24

p. 9.)  However, Sabella's estoppel defense was wholly equitable as it assumed the note was valid, but that enforcement would be inequitable based on Chen's supposed gift of the Two Bear Ranch. (See *id.* at p. 11)  Whether alleged as promissory estoppel or equitable estoppel, Sabella's defense was always a matter of equity, which left its determination up to the trial court.  (See *A–C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 472 (*A–C Co.*); *Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.)

The case authority cited by Sabella does not persuade us otherwise or warrant a different result.

In *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612 (*Unilogic*), the appellate court affirmed the trial court's decision to exercise its discretion to submit defendant's equitable defense of unclean hands to the jury, when the underlying facts of the defense were intertwined with the parties' legal causes of action.  (*Id.* at pp. 622–623.)  However, while the *Unilogic* court recognized "it was particularly prudent for the trial judge to exercise his discretion to submit [defendant's] unclean hands defense to the jury," nothing in the decision required the trial court to do so.  (*Id.* at p. 623.)  Likewise, Sabella's pleading an equitable defense to a legal cause of action did not entitle her to a jury trial on that defense.  (See *C & K Engineering*, *supra*, 23 Cal.3d at p. 9.)

In *Ford v. Super. Ct.* (1959) 176 Cal.App.2d 754, the defendants asserted various affirmative defenses in response to allegations they had fraudulently sold stock.  (*Id.* at p. 755.) The plaintiffs filed a writ petition asking the appellate court to restrain the trial court from proceeding in action without granting them a jury trial.  There, the trial court sustained the

25

defendants' objection to plaintiffs' jury trial demand on the grounds the affirmative defenses were "equitable." (*Id*. at pp. 755, 759.) The appellate court found that while the affirmative defenses were labeled as "equitable" they were "in reality legal issues" and the plaintiffs were entitled to a jury trial. (*Id*. at pp. 758–759.) Here, as discussed above, Sabella's estoppel defense was equitable as it assumes the note was a valid agreement. However, she alleged that it would be inequitable to require her to pay on the note because of Chen's purported promise that she would not be held financially responsible for the note, and because Chen gifted or promised to eventually gift her the Two Bear Ranch property.

In *DiPirro*, *supra*, 153 Cal.App.4th, the plaintiff sued the defendant seeking enforcement of the California Safe Drinking Water and Toxic Enforcement Act of 1986. (*Id*. at p. 163.) The trial court bifurcated the trial and tried defendant's statutory exemption defense first without a jury. (*Ibid*.) The trial court entered a judgment in favor of the defendant and the plaintiff appealed, arguing he was denied his right to a jury trial. (*Ibid*.) The appellate court affirmed, holding plaintiff was not entitled to a jury trial on defendant's affirmative defense as the "essential character and purpose" of the statute plaintiff sought to enforce was equitable. The appellate court explained the statute's purpose was to prevent contamination of sources of drinking water and required businesses " 'to warn individuals about carcinogens and reproductive toxins to which they are exposed through consumer transactions, employment, and the environment.' " (*Id*. at p. 180.) "An action that seeks to enforce the consequences of the listing of a chemical fundamentally seeks a form of declaratory relief—that the product requires a warning

under the Act—which is equitable in nature and does not carry with it the guarantees of a jury trial." (*Id*. at p. 181.)

Sabella argues that *DiPirro* demonstrates that the proper inquiry in determining the gist of the action is the nature of the action and the relief sought, and that because the nature of Rostack's action was legal, Sabella was entitled to a jury trial. However, *DiPirro* held "the trial court's bifurcation of the proceeding and separate initial adjudication of [defendant's] warning exemption defense did not transform the case into an action at law or require a jury trial." (*DiPirro*, *supra*, 153 Cal.App.4th at p. 184.) Notably, *DiPirro* agreed with other cases that, "even though issues of fact would be resolved in the adjudication of the warning exemption defense asserted under the Act, there is no 'jury trial right on affirmative defenses that can be tried separately and first.' " (*Id*. at p. 186.)

Sabella claims this case is akin to *Darbun*, *supra*, 239 Cal.App.4th 399 because the trial court misled her into believing regardless of the outcome of the first phase of trial, there would be a second phase to try her legal defenses. We find *Darbun* distinguishable.

In *Darbun*, the plaintiff sued defendant for breach of a lease agreement. (*Darbun*, *supra*, 239 Cal.App.4th at p. 401.) The trial court bifurcated the trial and held a bench trial on the equitable remedy of specific performance, and then held a second phase jury trial on the issues of breach and damages. (*Ibid*.) Although a jury found for the plaintiff and awarded damages, the trial court granted the defendant's motion for judgment notwithstanding the verdict based on its findings on the equitable issue. (*Ibid*.) The appellate court reversed, holding, "in cases involving mixed issues of equity and law, a trial court may not

27

act as a fact finder on issues it specifically reserves for jury determination." (*Ibid*.)

Unlike *Darbun*, the trial court did not expressly reserve any issues for the jury. Indeed, the trial court expressly stated when it severed the estoppel defense that its findings from the equitable phase of trial could obviate the need for a jury trial.

Sabella also cites to *Walton v. Walton* (1995) 31 Cal.App.4th 277 (*Walton*) for the proposition that where "one party raised cumulative legal and equitable remedies that were not mutually exclusive . . . [¶] . . . all claims—legal and equitable—must be tried, and the right to a jury trial cannot be defeated by severance of the equitable claim." (*Id*. at p. 293.) Sabella argues that her estoppel defense was not mutually exclusive from her legal defenses because her estoppel defense overlapped with her gift defense, as well as Rostack's breach of contract claim.

We note the language from *Walton* on which Sabella relies is dicta and a more recent appellate decision rejected it as such, noting that the language was "not supported by the authorities cited by *Walton*" and was otherwise unpersuasive given the "well-settled 'equity first' rule." (*Orange County*, *supra*, 12 Cal.App.5th at p. 358.)

In sum, Sabella's estoppel defense was an equitable defense to be decided by the trial court. Consequently, she has not shown an abuse of discretion where the trial court severed that defense and tried it before submitting the remaining legal claims to a jury under California's long-held equity first rule.

### 3. The trial court was not required to empanel an advisory jury and the law-of-the-case doctrine did not mandate a trial on her gift defense

Sabella argues that even if bifurcation was appropriate, the trial court should have empaneled an advisory jury on the equitable issues. However, Sabella has cited no authority holding an advisory jury must be empaneled. Indeed, a trial court has the authority to try an equitable defense with or without an advisory jury. (*C & K Engineering*, *supra*, 23 Cal.3d at p. 11.) Moreover, even if the trial court empaneled an advisory jury here, it would still have "to make its own independent findings" on Sabella's estoppel defense and could "adopt or reject the findings of the jury as it deem[ed] proper." (*A–C Co.*, *supra*, 173 Cal.App.3d at p. 474.)

Sabella also argues that the trial court abused its discretion in following the equity-first procedure because our decision in *Rostack I* concluded there was a triable issue of fact on Sabella's gift defense, therefore, the trial court had to submit the gift defense to the jury first. We do not agree with Sabella's interpretation of *Rostack I*.

Under the law-of-the-case doctrine, " ' "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." ' " (*Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 727.) While *Rostack I* found triable fact issues on the estoppel and gift defenses based on Sabella's allegations that Chen intended to gift Two Bear Ranch to Sabella and discharged the note, it made no conclusions

29

on the order in which her defenses should be tried or whether they should be tried by the judge or reserved for a jury.

### 4. There were no remaining issues for the jury to decide after the first phase of trial

Sabella argues that even if the trial court's factual findings resolved her gift defense, they did not resolve other issues in the case. These issues are "whether the contract was supported by consideration," "whether Rostack was damaged by any breach," and her "other affirmative defenses, including unjust enrichment and discharge." We disagree.

The trial court's findings in resolving the estoppel defense also resolved these remaining issues. Because Sabella's estoppel defense alleged that Chen never intended for her to pay back the amount due on the note, the trial court addressed whether the note was a valid contract between Rostack and Sabella. Accordingly, the trial court found the note "was a legitimate loan from Rostack to [Sabella], enforceable against her if she missed any payments" and that it had to be a valid loan to "fulfill its intended tax consequences." There was also no dispute Sabella breached her obligations under the note nor how much she still owed under the note. There was no dispute Sabella executed the note in favor of Rostack or that Sabella actually borrowed money on the note and only repaid $5 million. There was also no dispute Sabella failed to make interest or principal payments on the note after July 5, 2006. These facts establish all of the elements of Rostack's claims, and Sabella could not argue to the jury that the note was not enforceable because the trial court already had found that it was.

The trial court also correctly held that its findings during the first phase of trial necessarily precluded Sabella's other

30

affirmative defenses. Sabella's discharge and unjust enrichment defenses are premised on the existence of a gift from Chen, which the trial court found did not occur. Sabella's remaining defenses—lack of consideration, failure to state a claim, and lack of damages—were all based on her assertion that she did not receive borrowed funds directly from Rostack. But there was no dispute that Sabella executed the note in favor of Rostack or that Sabella and Chen "considered the [n]ote to be fully enforceable at all times." During her testimony, Sabella was unequivocal that the note was a "valid loan," on which she stopped making payments. Thus, there was nothing left for the jury to decide.

Sabella next argues that she did not have an opportunity to litigate the facts regarding whether Chen gifted her Two Bear Ranch or forgave the note, therefore, the trial court's findings cannot preclude her gift defense. Again, we disagree.

The record reflects Sabella litigated the facts relevant to her gift defense as part of the estoppel defense. An issue is " 'actually litigated "[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined*." ' " (*Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1330, citing *People v. Sims* (1982) 32 Cal.3d 468, 484; *Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 871.) Here, Sabella based her estoppel defense on the alleged gift and litigated those allegations at trial. The trial court made findings regarding whether a gift occurred or whether Chen had the donative intent to establish a gift.

Nonetheless, Sabella argues the trial court should not have ruled on whether there was a completed gift because her estoppel defense was based only on the intent to make a gift. But that argument is belied by Sabella's operative pleading, which based

her estoppel defense on both a completed gift and the promise to make the gift in the future. In either case, the estoppel defense required the trial court to determine Chen's alleged donative intent. The trial court thus appropriately decided whether the supposed gift had been completed.

Sabella chose to base her estoppel and gift defenses on the same allegations regarding the gift and presented extensive evidence on those allegations at trial. As such, the trial court was correct to decide the issue and Sabella was not entitled to present the same disputed facts to different fact finders. (See *Orange County*, *supra*, 12 Cal.App.5th at p. 355, fn. 52.)

## II. The trial court did not abuse its discretion in awarding Rostack attorney fees

Sabella's second appeal challenges the trial court's $21,371,996.77 attorney fee award to Rostack. That fee award included approximately $18.7 million in fees for Mayer Brown and $2.7 million in fees for Wilkinson, a Hong Kong law firm that assisted Mayer Brown during the litigation. Sabella puts forward two primary arguments in support of her contention that the fee award should be reduced.

First, Sabella asserts the trial court erred in awarding fees for work performed by Wilkinson. Sabella argues recovery of Wilkinson's fees is legally impermissible under Business and Professions Code section 6125 because Wilkinson's attorneys were not licensed to practice in California, and their work constituted the unlawful practice of law. Sabella also contends Wilkinson's work on the case was duplicative of Mayer Brown's.

Second, Sabella asserts the trial court abused its discretion by not reducing Rostack's fee request on the grounds that Mayer Brown engaged in excessive block billing; improperly rounded up

its time entries; engaged in excessive intra-office conferencing; and billed for clerical work.

Sabella's assertions are not persuasive.

### A.     Standard of review

We review the trial court's determination of a reasonable attorney fee for abuse of discretion.  (*Los Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 516.)

" 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488 (*Laffitte*).)  "Accordingly, there is no question our review must be highly deferential to the views of the trial court."  (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239.)  We will not reverse an attorney fee award absent a showing that the trial court clearly abused its discretion.  (*Track Mortg. Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 868.)

"An abuse of discretion is shown when the award shocks the conscience or is not supported by the evidence."  (*Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542, 549–550.)  " 'The trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice.  If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence.' "  (*Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512.)

### B. Rostack was entitled to recover Wilkinson's fees

Sabella argues Rostack cannot recover attorney fees paid to Wilkinson because Wilkinson engaged in the unauthorized practice of law in California, which is prohibited by Business and Professions Code section 6125. Sabella also argues, even if recovery of Wilkinson's attorney fees were not barred, the trial court abused its discretion in not reducing Wilkinson's fees for work that was unnecessary and duplicative of Mayer Brown's.

### 1. Wilkinson was not engaged in the unlawful practice of law in California

Business and Professions Code section 6125 reads: "No person shall practice law in California unless the person is an active licensee of the State Bar." Our Supreme Court has interpreted this statute as a bar to recovery of attorney fees for work performed by out-of-state attorneys, who were not licensed or otherwise authorized to practice law in California when the fees were incurred. (*Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 126 (*Birbrower*).) This bar, however, does not prohibit an award of attorney fees to an out-of-state attorneys, who "did not practice law 'in California' within the meaning of [Business and Professions Code] section 6125." (*Estate of Condon* (1998) 65 Cal.App.4th 1138, 1148 (*Condon*).)

In determining whether an out-of-state attorney violated Business and Professions Code section 6125, and therefore was not entitled to attorney fees, "[t]he primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations." (*Birbrower*, *supra*, 17 Cal.4th at p. 128; *Condon*, *supra*, 65 Cal.App.4th at p. 1145.)

*Birbrower*, at pages 128 and 129, states: "Physical presence here is one factor we may consider in deciding whether the unlicensed lawyer has violated section 6125, but it is by no means exclusive. For example, one may practice law in the state in violation of section 6125 although not physically present here by advising a California client on California law in connection with a California legal dispute by telephone, fax, computer, or other modern technological means. Conversely, . . . we do reject the notion that a person *automatically* practices law 'in California' whenever that person practices California law anywhere, or 'virtually' enters the state by telephone, fax, e-mail, or satellite." "Implicit in [*Birbrower*'s] formulation of the rule is the ingredient that the client is a 'California client,' one that either resides in or has its principal place of business in California. This conclusion is not only logical, it comports with the reason underlying the proscription of section 6125." (*Condon*, *supra*, 65 Cal.App.4th at p. 1145.) "It is therefore obvious that . . . the client's residence or its principal place of business is determinative of the question of whether the practice is proscribed by section 6125. Clearly the State of California has no interest in disciplining an out-of-state attorney practicing law on behalf of a client residing in the lawyer's home state." (*Condon*, at p. 1146.)

Here, Rostack was not a California client. Rostack is a Liberian corporation based in Hong Kong with Hong Kong-based officers and directors. Nor is there any indication Wilkinson was practicing law in California. Indeed, Rostack only sought fees for Wilkinson's "taking instructions at the outset of the case, interviews with witnesses and preparation of their statements, review and product of documents for Rostack's production of documents throughout the case"; and "taking instructions from,

35

and discussing the case with, Rostack." This was not practicing law in California and was perfectly reasonable given the global nature of this case. As this case again proves, "[s]ocial interaction and the conduct of business transcends state and national boundaries; it is truly global." (See *Condon*, *supra*, 65 Cal.App.4th at pp. 1145–1146.)

Sabella argues Wilkinson was practicing law in California because "Wilkinson continuously and unlawfully advised Rostack on matters of California law and legal instruments for issues presented before a California Court" and "conducted legal work on pleadings related to issues ruled under California law and to be filed in a California court." Sabella cites to examples contained in a Wilkinson attorney's declaration in support of the fee motion, which states that he was "advising [Rostack] about [the] draft Complaint," "[w]riting to client for instructions with regard to the Answer," "[w]riting to client for instructions in relation to draft Motion," and "[w]riting to client for instruction in relation to the draft [discovery] Responses." However, our review of those examples show Wilkinson often acted as an intermediary between Mayer Brown and Rostack, which was reasonable given "[v]irtually all percipient witnesses in the case reside in or about, and/or were deposed in, Hong Kong" and Wilkinson was familiar "with certain procedures in Hong Kong relating to litigation and to conduct effectively certain Hong Kong proceedings involving judicial officers known as examiners." These examples do not show Wilkinson was practicing law in California within the meaning of Business and Professions Code section 6125 under the circumstances. (*Birbrower*, *supra*, 17 Cal.4th at 128.)

Sabella cites to *Golba v. Dick's Sporting Goods, Inc.* (2015) 238 Cal.App.4th 1251 to argue Wilkinson attorneys should have

36

applied to appear *pro hac vice.* We find that case inapposite. There, the appellate court affirmed the trial court's decision not to award attorney fees to an out-of-state attorney, who was effectively acting as lead counsel in a class action where California residents were putative class members. (*Id.* at p. 1264.) The attorney "though not physically present in California, had 'sufficient contact with the California client to render the nature of the legal service a clear legal representation' and 'created a continuing relationship with the California client that included legal duties and obligations.' " (*Id.* at pp. 1264–1265, citing *Birbrower, supra,* 17 Cal.4th at p. 128.) As discussed above, Wilkinson attorneys never appeared in this case, thus, *pro hac* admission was unnecessary for recovery of fees.

### 2.     **Wilkinson's work was not duplicative**

Next, Sabella argues the trial court abused its discretion by not eliminating Wilkinson's fees as duplicative and unnecessary.

Sabella takes issue with the fact that Rostack retained two law firms in this case. Citing *Donahue v. Donahue* (2010) 182 Cal.App.4th 259, Sabella contends the trial court must approach the use of multiple firms with caution because "simultaneous representation by multiple law firms pose[s] substantial risks of task padding, over-conferencing, attorney stacking (multiple attendance by attorneys at the same court functions), and excessive research." (*Id.* at p. 272.) While there is no per se bar on retaining more than one law firm in a litigation, duplicative efforts by counsel may not be compensated. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).) Accordingly, a party may recover fees for multiple law firms so long as the work is not duplicative and unnecessary. (See

37

*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375–1376.)

In support of its attorney fee request, Wilkinson provided the monthly invoices billed to Rostack, which totaled $6,764,812.97. However, to avoid recovery of work done by Wilkinson that may have been duplicative of work done by Mayer Brown, Wilkinson sought fees for only three categories of work mentioned above. This exclusion of other types of legal work reduced the requested fees to $2,666,257.05.

Despite these exclusions, Sabella points to several examples to show Wilkinson's work duplicated Mayer Brown's. In one instance, two Wilkinson attorneys spent over 33 hours preparing for and attending a deposition. For that same deposition, Mayer Brown attorneys traveled to Hong Kong, and spent over 44 hours preparing and attending the same deposition.

This example is not persuasive. Sabella ignores the fact that Mayer Brown's time entries also included time for preparing and attending the deposition of other witnesses. Moreover, Sabella's example rings especially hollow where Sabella's own Hong Kong counsel appeared alongside her California counsel at the same deposition. As we do here, " 'The court can look to how many lawyers the other side utilized in similar situations as an indication of the effort required.' " (See *Donahue v. Donahue*, *supra*, 182 Cal.App.4th at p. 272.)

Sabella also cites an example where a Mayer Brown attorney spent 59.5 hours on an opposition to Sabella's motion to strike Rostack's motion for summary judgment. On the same motion to strike, three Wilkinson attorneys billed 23 hours for writing to Rostack for comments and instructions in relation to

the opposition to the motion to strike, and then discussing and considering Rostack's comments. Again, we do not find this example indicative that Wilkinson's work was duplicative of Mayer Brown's. Mayer Brown's time entries at issue also include work on its reply brief in support of its motion for summary judgment, which was filed around the same time. Further, communicating with and getting comments from the client are distinct tasks from drafting a motion or opposition brief.

Sabella also takes issue with Rostack's claim that Wilkinson's assistance was necessary to navigate procedural issues in Hong Kong, when Rostack is a Liberian corporation litigating in California under California law. Rostack's country of incorporation notwithstanding, Rostack's directors, accountants, in-house attorneys, documents, and witnesses were located in Hong Kong. Sabella also questions Rostack's need for Hong Kong-specific counsel when Mayer Brown is a sophisticated, international law firm, with a sizable presence in Hong Kong. However, Sabella does not explain how employing more lawyers from the same law firm would have resulted in less hours worked.

Sabella also questions how Wilkinson could accumulate nearly $3 million in fees given its limited contribution to the case. Sabella seems to ignore the undeniable fact that this case was hard fought for 12 years in California and Hong Kong. Indeed, as Sabella herself acknowledged in a motion for an undertaking, the case was "aggressively litigated" since its inception, and disclosed in that motion that one of her three law firms had billed approximately $1.5 million for 11 months of work at the beginning of the case. "A comparative analysis of each side's respective litigation costs" is "a useful check on the

39

reasonableness of any fee request." (*Donahue v. Donahue, supra*, 182 Cal.App.4th at p. 272.)

Sabella also complains that Wilkinson billed for tasks that Mayer Brown could have handled itself, for example, taking client instruction, dealing with local witnesses, or communicating with the client. However, as we have already discussed, whether these tasks were done by one firm or two, the trial court correctly found the hours spent on those tasks were compensable.

## C. The trial court properly exercised its discretion in not applying a negative multiplier to the fee request

Sabella next argues that the trial court abused its discretion when it declined to apply a negative multiplier to work performed by Mayer Brown which engaged in block billing, improperly rounded up its time entries, engaged in excessive intra-office conferencing, and billed for clerical work.

### 1. Block billing

"Block billing occurs when 'a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task.'" (*Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 279.) While block billing is "not objectionable per se," a trial court may penalize a party for the practice when it hinders the trial court's ability to discern between compensable and noncompensable tasks. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1325.)

Here, we find no abuse of discretion in the trial court's decision not to reduce Rostack's fee award as a penalty for block billing. The trial court is the best judge of the professional services rendered (*Laffitte, supra*, 1 Cal.5th at p. 488) and block billing is only inappropriate to the extent it obscures the ability of

the trial court "to determine whether the tasks described . . . reasonably required the total amount of time billed." (*Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 102–103.)  In Sabella's cited example entries of Mayer Brown's block billing, the trial court correctly found the entries were sufficiently detailed to allow the trial court to discern between compensable and noncompensable tasks.  Under the circumstances, we are not convinced that the trial court's judgment regarding these entries was  " ' 'clearly wrong." ' " (*Laffitte*, at p. 488.)

## 2. Quarter-hour billing

Sabella next argues that the trial court abused its discretion in declining to apply a negative multiplier to Mayer Brown's entries because they were billed in quarter-hour increments rather than in one-tenth-hour increments.

Citing *Lopez v. S.F. Unified Sch. Dist.* (N.D. Cal. 2005) 385 F.Supp.2d 981, *Welch v. Metropolitan Life Ins. Co.* (9th Cir. 2007) 480 F.3d 942, and *Zucker v. Occidental Petroleum Corp.* (C.D. Cal. 1997) 968 F.Supp. 1396, Sabella contends that quarter-hour billing is "roundly condemned by courts."  In response, Rostack cites *Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, to argue "California courts routinely award fees based on time billed in quarter-hour increments."  However, neither parties' citations appear correct.

Just as with block billing, the issue is not the practice itself, but whether the amount of hours claimed are an accurate reflection of the time expended on the case.  As the Ninth Circuit explained, "The [trial] court was in the best position to determine in the first instance whether counsel's practice of billing by the quarter-hour resulted in a request for compensation for hours not

41

reasonably expended on the litigation." (*Welch v. Metropolitan Life Ins. Co.*, *supra*, 480 F.3d at p. 948.)

Here, the trial court found that Rostack's fee request was reasonable based on the hourly rates, which were comparable to the rates of Sabella's counsel, and because the total amount of time expended was appropriate given the length and complexity of the action. "[Sabella] has not articulated specific examples of instances where [Rostack's] counsel's bill seems to reflect an unreasonable amount of time and labor spent." Accordingly, we find no abuse of discretion in the trial court's decision to not reduce Rostack's fee award.

### 3.      Excessive intra-office conferencing

Sabella next argues that the trial court should have reduced Rostack's fee award for excessive intra-office conferencing. Sabella takes issue with the number of attorneys that were staffed on the case, and the fact that a large percentage of Mayer Brown's time entries included intra-office conferencing.

Sabella's comment that it is "inconceivable to justify the need for so many lawyers" and her characterization of the case as a simple disagreement between two parties over a loan is not well taken.

Mayer Brown's declarations submitted to the trial court in support of its fee conclusively refute Sabella's mischaracterization of the litigation. While Rostack acknowledged that it initially believed this case would be a straightforward collection action, the case became "materially complicated" when Sabella claimed the loan was actually a gift from the outset, and then further complicated the issue, when she switched theories to claim the loan was gifted to her at some later point in time. We agree with Rostack that this case involved

litigating "numerous and complex issues rarely found in collection cases." Moreover, as Rostack stated in its attorney declarations in support of its fee motion, which the trial court accepted, additional factors complicated the litigation, including: service of Sabella under the Hague Service Convention since Sabella lived in Hong Kong when the action was filed; the issuance and enforcement of letters rogatory in connection with the depositions of Vivien Chen and Alan Chan; Rostack's standing to sue; gift law and conflicts of law in both Hong Kong and California; at least 35 motions (including in limine motions) since 2009; ink-dating experts based on Sabella's claims someone doctored the original proposal drafted on Sabella's behalf requesting that Chen gift her money to repay the note; the alleged theft from Sabella of the original proposal; examining Hong Kong police reports and questioning Sabella about them; Sabella's laches defense that Rostack did not diligently pursue its claim; taxpayer privilege based on Sabella's "tax planning" defense and whether Sabella's U.S. income tax treatment of the note was consistent with her claims regarding the alleged gift; whether Chen or his estate was an indispensable or necessary party; Sabella's attempt to disqualify a trial judge for personal bias; three writ petitions in the Court of Appeal and two petitions for review in the Supreme Court involving taxpayer privilege and disqualification issues; issues related to Sabella's posting of $70 million in security to stay enforcement of the 2014 judgment and whether the surety bond costs were immediately required to be paid; undertaking expensive preparation for trial on numerous occasions, including once in 2011, twice in 2012, twice in 2013, once in 2014, and once in 2019; preparing exhibit lists, witness lists, jury instructions, deposition designations, outlines of

witness testimony and cross-examinations, motions in limine and factual investigation, including obtaining documents from Hong Kong immigration authorities to show where Sabella and Vivien were on certain dates; trying the case for nine days over a multi-month period; and litigating whether the result of the bench trial fully resolved Rostack's claims and Sabella's remaining defenses under the equity first rule.

In declining to reduce the fee award for intra-office conferencing, the trial court found that "[t]his case involved complex litigation strategies and it is not unreasonable for [Mayer Brown's] attorneys to confer with each other as to how the firm decided to litigate this case." Thus, the trial court had a reasonable basis for awarding Rostack its requested fees. (See *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1008.)

### 4. Clerical tasks

Finally, Sabella argues that the trial court abused its discretion by not reducing Rostack's fee award for clerical tasks.

As an initial matter, necessary overhead support services that secretaries and paralegals provide to attorneys may be included in an attorney fees award. (*City of Oakland v. McCullough* (1996) 46 Cal.App.4th 1, 7.) Administrative tasks are recoverable in the trial court's discretion. However, charging for purely clerical tasks at an attorney's hourly rate is questionable. (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.)

Sabella's expert extracted numerous entries from Mayer Brown's billing records that showed approximately 1,080 hours' worth of time entries including clerical tasks. Our review of these records does not demonstrate the trial court abused its discretion in not reducing the fee award for these entries. Nearly

44

every item identified by Sabella's expert was completed by Mayer Brown's paralegal or a document clerk. Therefore, Mayer Brown did not count attorney time towards clerical tasks. To the extent Sabella's expert identified clerical tasks billed by a law firm associate or partner, our review of those time entries shows that they were not clerical.

## III. Rostack is not entitled to recover its bond costs under any statute or under the terms of the note

In Rostack's appeal, Rostack challenges the trial court's decision to not award Rostack costs in the amount of $1,366,104.28, which are the costs awarded to Sabella in *Rostack I*. (*Rostack I*, *supra*, B260844.) Rostack argues it is entitled to these costs by statute and under the terms of the note. We disagree.

### A. Standard of review

" ' "[T]he right to recover costs is purely statutory, and, in the absence of an authorizing statute, no costs can be recovered by either party." ' " (*Gorman v. Tassajara Dev. Corp.* (2009) 178 Cal.App.4th 44, 71.) We review whether the criteria for an award of costs have been satisfied de novo. (*Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1139.) We "independently review contract interpretation where, as here, there is no extrinsic evidence about contract meaning and the facts are undisputed." (*Bravo v. RADC Enterprises., Inc.* (2019) 33 Cal.App.5th 920, 922.)

### B. The law-of-the-case doctrine does not apply to whether Rostack is entitled to recover the bond expenses

As an initial matter, Sabella argues that the law-of-the-case doctrine bars Rostack's recovery of those appellate costs

45

awarded to Sabella in *Rostack I* based on this court's decision in *Rostack II*. As stated above, the law-of-the-case doctrine applies when " ' "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." ' " (*Bell v. Farmers Ins. Exchange, supra*, 115 Cal.App.4th at p. 727.)

We disagree that *Rostack II* conclusively decided the issue before us here. Indeed, we specifically declined to address whether Rostack would be able to recover those costs at the end of the litigation if it was the prevailing party. (*Rostack II, supra*, 32 Cal.App.5th at p. 80.) We stated it would be "premature" to consider that issue given there had "been no trial, no prevailing party on the contract, and no attempt to recover any such costs under the [note]." (*Ibid.*)

Because that issue was not decided in the prior appeal, the law-of-the-case doctrine does not apply. (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 824.)

### C. Rostack is not statutorily entitled to recover the surety bond costs under any statute

Turning to the merits, Rostack argues, because it is the prevailing party under section 1032, subdivisions (a)(4) and (b), as well as under Civil Code section 1717, subdivision (a), it is entitled to reimbursement for the amount paid to satisfy the judgment entered in Sabella's favor for the amount of the surety bond expenses that were awarded to her in *Rostack I* and affirmed in *Rostack II*. We disagree.

" 'Costs are allowances which are authorized to reimburse the successful party to an action or proceeding and are in the nature of incidental damages to indemnify a party against the

46

expense of successfully asserting his rights.' " (*DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1147, citing *Purdy v. Johnson* (1929) 100 Cal.App. 416, 418; § 1033.5.) " 'The party to blame pays costs to the party without fault.' " (*Purdy v. Johnson*, at p. 418.)

Section 1032, subdivision (b), provides "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Section 1032, subdivision (a)(4) defines a " '[p]revailing party' " as the party with a net monetary recovery. Civil Code section 1717, subdivision (a), provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." The party who recovered "greater relief in the action on the contract" is the prevailing party under Civil Code section 1717. (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 529.)

Here, Rostack is undoubtedly the prevailing party under both section 1032 and Civil Code section 1717. Nevertheless, we hold Rostack is not entitled to reimbursement for the appellate costs awarded to Sabella in *Rostack I.*

Rostack asserts, as the prevailing party under section 1032, it is entitled to the surety bond expenses under section 1033.5, subdivisions (a)(6) and (a)(16), which list as allowable costs "[p]remiums on necessary surety bonds" and "[a]ny other item

47

that is required to be awarded to the prevailing party pursuant to statute as an incident to prevailing in the action at trial or on appeal." However, "the very language and context of . . . section 1033.5 indicates that it does not govern costs on appeal." (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 259.) " 'The context of section 1032—using language that speaks of plaintiffs, defendants and prevailing parties being those with a "net monetary recovery"—implies that the statute is directed at the trial court. So does the context of section 1033, with its reference to a party recovering a judgment. Section 1033.5, which is a list of what is, and is not, allowable as a cost, similarly is trial-court-oriented, with items exclusively related to trial court proceedings (e.g., references to jury fees, taking depositions, process servers, etc.).' " (*Stratton v. Beck* (2018) 30 Cal.App.5th 901, 910.) In fact, " 'section 1034, subdivision (b) . . . tells us specifically what law governs costs on appeal.' [Citation.] It provides, 'The Judicial Council shall establish by rule allowable costs on appeal and the procedure for claiming those costs.' (§ 1034, subd. (b).) That rule is California Rules of Court, rule 8.278, which is entitled 'Costs on appeal.' " (*Ibid*.)

Cal. Rules of Court, rule 8.278(a)(1) provides: "Except as provided in this rule, the party prevailing in the Court of Appeal in a civil case other than a juvenile case is entitled to costs on appeal." Under Cal. Rules of Court, rule 8.278(a)(2), "[t]he prevailing party is the respondent if the Court of Appeal affirms the judgment without modification or dismisses the appeal. The prevailing party is the appellant if the court reverses the judgment in its entirety."

The provisions allowing costs on appeal do not depend on the party winning the appeal being the ultimate prevailing party

48

in the lower court.  (*Presley of Southern California v. Whelan* (1983) 146 Cal.App.3d 959, 2.)  This is why, as we explained in *Rostack II*, *supra*, 32 Cal.App.5th at page 78, a successful litigant on appeal may immediately enforce an award of costs on appeal.  (See also *First Nat. Bank of San Pedro v. Stansbury* (1931) 214 Cal. 190, 192; see also *Butler-Rupp v. Lourdeaux* (2007) 154 Cal.App.4th 918, 927.)  This is so because "[t]here is no interdependence between the judgment for costs of the former appeal and any judgment which may subsequently be entered in the main case."  (*Rostack II*, at p. 78.)  Rather, an appellate cost award is enforceable as a separate money judgment and "conceptually separate" from the underlying trial court judgment.  (*Lucky United Properties Investment, Inc. v. Lee* (2013) 213 Cal.App.4th 635, 655.)

Thus, we conclude that whether Rostack is the prevailing party under section 1032 has no bearing on the cost award in *Rostack I* where Sabella was the prevailing party under California Rules of Court, rule 8.278.

We likewise reject Rostack's argument that it is entitled to reimbursement for the surety bond expenses because it is the prevailing party under Civil Code section 1717.

"The provisions allowing costs on appeal . . . are entirely separate from [Civil Code section 1717] and do not depend on the party winning the appeal being the ultimate prevailing party."  (*Mustachio v. Great Western Bank* (1996) 48 Cal.App.4th 1145, 1150.)  A party who successfully appeals a judgment, but who is still not a prevailing party under section 1717 based on the final judgment, is still entitled to recover his costs on the successful appeal.  (See *Snyder v. Marcus & Millichap* (1996) 46 Cal.App.4th 1099, 1102.)  Thus, even though Rostack is the

prevailing party under Civil Code section 1717, it is not entitled to reimbursement for Sabella's award of appellate costs in *Rostack I*.

Our ruling finds analogous support in those cases that held, where a party is entitled to recover costs by virtue of its success on its first appeal but ultimately loses at trial, the trial court should set off the costs when determining the amount to award the party who prevailed at trial. (*Crenshaw v. Smith* (1946) 74 Cal.App.2d 255, 269; *Layne v. Superior Court, City and County of San Francisco* (1932) 121 Cal.App. 206, 208; *Passow & Sons v. U.S. Fidelity & Guaranty Co.* (1922) 56 Cal.App. 72, 78–79.)

**D.    Rostack is not entitled to recover the bond costs under the terms of the note**

Rostack argues, even if it is not entitled to recover the costs as a matter of right under California law, it is still entitled to recover them under the note. Again, we disagree.

The terms of the note provide: "Upon [Sabella's] failure to pay all amounts declared due pursuant to this section, including failure to pay upon final maturity, [Rostack] may hire or pay someone else to help collect this [n]ote if [Sabella] does not pay. [Sabella] also will pay [Rostack] that amount. This includes, *subject to any limits under applicable law*, [Rostack's] attorneys' fees and [Rostack's] legal expenses . . . for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services." (Italics added.)

Under the terms of the note, Rostack's entitlement to legal expenses is subject to any limits under applicable law. As we explained in *Rostack II*, Sabella was entitled to recover her costs

on appeal in *Rostack I*. (*Rostack II*, *supra*, 32 Cal.App.5th at p. 78.) And, as we have explained above, the bond costs were not allowable costs under section 1033.5 and Rostack is not entitled to reimbursement for those costs under either section 1032 or Civil Code 1717 as the prevailing party in the litigation. Sabella remains the prevailing party in *Rostack I* under California Rules of Court, rule 8.278.

We also reject Rostack's argument that the note provides a broader definition of allowable costs. "[C]ontractual costs provisions are presumed to adopt the statutory definition absent evidence to the contrary." (*Hsu v. Semiconductor Systems, Inc.* (2005) 126 Cal.App.4th 1330, 1341.)

## DISPOSITION

The judgment and orders are affirmed. Costs are awarded to Rostack in Case No. B311811. With respect to Case No. 314779, the parties are to bear their own costs.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.

51